Come on up. Hang on a second. Let everybody get settled. All right, sir. I think we're ready. Your Honors, good morning. May it please the Court. The sole issue before the Court today is whether the Bankruptcy Court's order approving an indemnification subtrust is a plan modification under Section 1127 of the Bankruptcy Code. If it is, then I believe that this Court should reverse and render judgment that the proper method for approving that subtrust was not followed. In other words, that there's nothing left to do here on remand. If the Court concludes otherwise, then we concede that the Bankruptcy Court was within its discretion in approving this order. Your Honors, I think a couple preliminary questions might drive the rest of this analysis. First, if the debtor is correct and that what happened here was contemplated by the confirmed plan, then why file a motion? Why obtain a Bankruptcy Court order if all that was happening was just the form of the substance was being tweaked? And Your Honors, that's not just my question. That's this Court's question in the binding precedent here, U.S. Brass, where this Court said, well, if this is not changing something in the plan, then why have to file a motion and get a court order? Your Honors, the Federal Courts are not in the business of granting comfort orders. There's a reason why this order wasn't. I don't know that that's true, at least not in the Bankruptcy Courts. But anyway, go ahead. Well, Judge King, I think that the reason why someone would want a quote-unquote comfort order is to obtain quasi-judicial immunity. In other words, if you are implementing a court order, then you can't be sued for that. So why someone would want that is precisely because what they're doing is not provided for in the plan and precisely because it might actually violate the plan. That's the only logical reason why the debtor would go through this motion practice. The second thing, Your Honors, I want to address. Why isn't it just being respectful of the Bankruptcy Court to make sure they're aware of what's happening and that you're not missing something? Your Honor, then you file a status report with the Bankruptcy Court, but with due respect, Judge Haynes, Bankruptcy Court jurisdiction doesn't rest on being respectful to the Bankruptcy Court. It rests on whether the estate is being administered and whether there is subject matter jurisdiction. And I would, again, I understand that people get quote-unquote comfort orders from Bankruptcy Courts. I understand that that's become the practice, especially in a large, complicated case like this. But that's not the principle. And that's not what U.S. Brass says. That's not what 1127 says. Briefly to address this issue of excentiousness, which seems to be the debtor's get-out-of-jail-free card every time that we come here to New Orleans, the Bankruptcy Court has found that Mr. Dondero has acted vexatiously. I really question how that's possible when former Bankruptcy Judge Dennis Michael Lynn, before he died, represented Mr. Dondero. And I can't imagine anyone suggesting that former Judge Lynn would have acted vexatiously. But the findings of fact are what they are. I would respectfully suggest . . . Well, representing someone isn't the same as being that someone. But I would respectfully suggest that necessity, the wisdom of what the debtor did, the alleged necessity of what the debtor did, doesn't pass muster under Section 1127 of the Bankruptcy Code. That is a shall provision. It says that the Court can approve a plan modification only if various requirements are followed. And my final preliminary point, Your Honors, is that this is not procedural. This is very much substantive. If we recall what a Chapter 11 plan is, it is a new contract. In this case, it's even more important because the Bankruptcy Court confirmed this new contract over the rejecting class of unsecured creditors. The debtor states that the vast majority of creditors accepted this plan, which is partially true when you look at the size of their claims. But the majority, in number, of creditors rejected this plan. Unsecured creditors did, which means that the Bankruptcy Court confirmed the plan originally on cram down. Now what the Bankruptcy Court was doing, our argument goes, was unilaterally modifying the plan. Your Honors, basic contract law, a party cannot unilaterally modify a contract. That is what Section 1127B exists to prevent and protect against here. Once you have a new contract in the form of a Chapter 11 confirmed plan, to change that requires that you go through the process again, creditor voting being the most important thing. And Your Honors certainly know that this Court a few months ago reversed a portion of that confirmed plan that provided broad exculpations to very many people that were- It's not anything relevant to this case. Agreed, Your Honor. But my point again is that the creditors would have been highly interested in a vote when $25 million of their assets are temporarily being parked somewhere, when the debtor is assuming new indemnification obligations, and when these exculpation provisions were stricken from the plan by this Court. Again, why not put it to the creditor vote? Why not follow the process? So Your Honor, what is a plan- Your Honors, what is a plan modification? Again, we have from U.S. brass that a plan modification is something that alters the rights, obligations, or expectations of the parties. And I would submit to the Court that that is a very low threshold. In other words, that any modification, anything that changes the parties' rights, expectations, or obligations is a plan modification. In U.S. brass, the plan provided for the adjudication of claims by federal court procedure. They tried to change it to make it arbitration, and this Court said, no, that's a modification. Again, the intent of the plan was that these disputed claims be adjudicated, but the manner in which it was to be done now became a plan modification. In another case that we cite, Your Honors, the plan provided that a trustee would prosecute causes of action post-confirmation. The debtor wanted to change that with the debtor doing so, and the Eastern District of Texas said, wait, that is a plan modification. So again, the plan contemplated that these causes of action would be monetized, but how it was to happen was equally as important. And we have other opinions where we've cited that are non-binding, where deadlines were being changed, deadline to pay creditors were being changed, and the courts always found that those were plan modifications. Here we have three reasons primarily why this indemnification order is a plan modification, and not an ordinary course transaction, I'm sorry, a transaction out of the ordinary course under Section 363B of the Bankruptcy Code. The plan, it's undisputed, originally contemplated that the debtor and its fiduciaries would obtain directors and officers' liability insurance, D&O insurance. They were not able to do so. The plan let them, with the creditors' committee, waive that requirement, which they did. That now left them exposed. So the expectation was D&O insurance, yes, it could be waived, but now what? Nothing in the plan provided for the creation of this trust. So right there we have a change of expectations. Second, we're creating a trust. We are creating a trust with a trustee, with a trust document. Your Honors, that's not what happens under Section 363 of the Bankruptcy Code. The creation of a trust is something that happens under a plan. To do so under Section 363 is in fact a sub rosa plan. Your Honors, we're creating a trust here to pay claims, in this case administrative claims, potential, and post-confirmation potential claims. That's what happens under a plan, not on a motion. But why did they not go forward and get approval on this? Your Honor, Judge King, I do not know. Again, I assume that it was a shortcut to do it quickly, and I assume that it was because they were concerned that the creditors would again vote down the modification as they did originally, and that the Bankruptcy Court might deny it. So Your Honors, that's the creation of this trust. Now we have also $25 million of creditor recoveries going to the trust. $2.5 million in cash, even though the plan originally provided that all available cash would be sent to the claimant trustee. And we have a new $22.5 million note. That is a priority note. That is a cost of administration. That $22.5 million note, if called, would have to be paid in full before creditor recoveries. So Your Honors, we have $25 million. Depending on the numbers, perhaps Mr. Pomerantz knows more. That's 10, 15 percent of anticipated creditor recoveries. It is true that the full $25 million comes back if there are no future indemnification obligations. But we're looking at years and years and years while statutes of limitations run under federal securities laws. So that $25 million is being parked. And three, which I think is the most important point, and this is a point of contention, where I'm convinced that I'm right. The order changed the plan's modification obligations. That argument has two components. It is true that the plan allowed the trustee to create reserves, to create reserves to protect against the trust's indemnification obligations. A reserve is discretionary. A reserve need not be funded. Funded reserves can be taken back. Now we have an obligation, a legally binding obligation of $25 million. And here, this is the key to my argument, Your Honors. The plan created three post-confirmation legal entities. It created the reorganized debtor. The reorganized debtor has its management under a general partner, and it manages billions of dollars of third-party assets. It's going to get sued. Every manager of billions of dollars of assets gets sued. There's no necessary vexatiousness behind it, but they're subject to all kinds of federal securities laws, all kinds of contracts. Then the plan creates the claimant trust. This is the master trust responsible for paying creditors. And then the plan creates the litigation subtrust. That's a trust that goes on and sues people to try to augment the estate by affirmative causes of action. Under the original plan, each entity indemnified its own agents. And I say agents loosely. We're talking about directors, officers, etc. I'm using shorthand. The reorganized debtor indemnified its people. The claimant trust did not. The litigation trust indemnified its people. The claimant trust did not. The claimant trust indemnified under the plan exactly three entities. Its trustee, the litigation subtrustee, and then members of the post-confirmation creditor oversight board. That's it. Those are the three entities that the claimant trust, the vehicle to repay creditors, was liable to indemnify. Not the general partner of the debtor, not the general partner's past, present, future employees, agents, attorneys, representatives, etc. So that's the key. That is what really happened here. And that's why I believe that what happened here was a sleight of hand to creditors. Because it's not until you get really into the weeds of the hundreds of pages of plan documents and trust documents that you realize that the debtor is correct. All of these people were originally indemnified under the plan under some entity, but they were not, and that's the key to my argument, indemnified by the claimant trust. This is not semantics. This is not much ado about nothing. Let's look at the reorganized debtor. Let's assume that it goes out there and commits a serious tort, and is embroiled in years of litigation and fails. Well, the whole point of the plan was that the claimant trustee could walk from it, right? Because the claimant trustee's job is to recover money, provide money, payments to pre-petition creditors. So they decided to go forward in the business for over the course of a few more years, try to make some money from this business. But if the business gets sued, class action, SEC violations, who knows, the claimant trustee under the plan could jettison it. Like any owner, using limited liability structures could say, okay, we tried, c'est la vie. Now the claimants have basically backstopped to the tune of $25 million. Those future operations. Likewise with the litigation subtrust. I have no reason to believe that that trustee is going to commit Rule 11 violations or engage in any kind of inappropriate litigation. But what if there's counterclaims back against the litigation subtrust for attorney's fees under Tufta, under 38.01? Various methods. Previously, the master trustee could just walk from it because of the limited liability nature. Now there's this $25 million new obligation. Who was the bankruptcy judge here? Judge Jernigan, Your Honor. Stacey Jernigan. So, Your Honors, I think that if we look at those three facts, the creation of a whole new trust with its own trustee and its own governing documents, the funding of $25 million of credit to recoveries, and the expansion of the claimant trust indemnification obligations to where now they're mandatory and covering all of these individuals that were previously not indemnified, you have an altering of the party's rights, obligations, and expectations under the original plan. It was not subject to voting. It was not subject to the same multi-day evidentiary trial we had on the original plan. This Court has already vacated significant, a significant portion of that original plan. I submit respectfully that we would have had those similar rights had this modification been done the appropriate way, and I just urge the Court not to see this case as much ado about nothing or no harm, no foul. A debtor should not ever be permitted or a trustee should not ever be permitted to unilaterally modify something that the Bankruptcy Court confirmed after a multi-day evidentiary hearing upon discovery under the guise of necessity, under the guise of business judgment. Thank you, Your Honors. All right. Thank you, sir. Mr. Pomerantz. Whoa, Mr. Pomerantz. You've got a load up there. I'm going to have to talk fast. Well, I'm from New York. I do talk fast. Your Honor, may it please the Court, I'd like to first address the comment that Judge King had in asking why did we file the motion. Well, we were at confirmation, and as the Bankruptcy Court in paragraphs 17 to 19 and 77 to 79 of the confirmation order detailed, litigation was front and center. The ability to go effective was front and center. The ability to get D&O insurance was front and center. The credits committee was right beside the debtor. The effective date on obtaining insurance. The next couple of months, the debtor worked closely with the committee to try to get that insurance so it would become effective. We did not have an effective date of a plan yet. We were under the jurisdiction of the Bankruptcy Court, subject to its rules and obligations and the code. When we couldn't get the insurance because of these appellants, because of the debtor's reputation in the insurance industry and in these cases, we had a problem. We had a chicken and egg problem. What do we do? We can't go effective. We had the people who had to sign off on waiver of the condition, the debtor, the claimant trust, the oversight committee, the litigation subtrust. They wouldn't proceed. So we had a chicken and egg situation. So what did we do? We went for an alternative. And proceeding by motion during the period between confirmation and the effective date, nothing unusual with that. In fact, in this case, we needed exit financing. So what did we do? After confirmation, we filed a motion under 363 to obtain exit financing, which was approved. So the concept of you can't file any motion, you have a confirmed plan, there's nothing to be said to that. We wouldn't be able to have gone effective. And I'm sure if we had not filed the motion, they would be up here saying we should have filed the motion. This court should affirm the district court because the plan and the implementation documents permit the claimant trust to contribute assets to the indemnity trust if the litigation subtrust or the reorganized debtor cannot satisfy their obligations. And because of that, the district court held that this was self-insurance and the functional equivalent of the reserves that were provided for in the plan and the implementing documents. There was no plan modification, and the debtor was not required to comply with Section 1127. And in so ruling, the court, the district court relied on U.S. Press, determining that shifting to self-insurance did not alter the party's rights, obligations, and expectations under the plan, which is the circuit standard for when something is a plan modification. Appellants concede now, which they didn't before the district court or in the original briefing, that the indemnity trust does not create any indemnification obligations. All it does is secure the obligations if the reorganized debtor and the litigation trust cannot pay for those obligations. And they concede that all those documents provided broad indemnification rights for officers, directors, agents, and employees, and that the parties under those documents first needed to look to their entity, and it was only if their entity did not have the indemnification obligations could they put in a claim to the indemnity trust. And it appears from reading the papers that they concede that the plan and implementation documents also allowed the claimant trust to fund the expenses of the litigation subtrust. I heard something different from Mr. Rugiboni here, but on his opening brief, page 7, he seemed to say that the litigation subtrust funding was okay. And the authority exists several places in the plan. Article 4B1 of the plan, Sections 2.3.B.5, 3.2.C.6, and 3.3.B.6 of the claimant trust agreement. Walk us through how this plays out. If we were to simply to affirm, walk us through how this $25 million kind of plays out over time. What happens to it? What are the odds and ends that may occur? So kind of where do we end up down the road? Sure. The $25 million is in the indemnity trust. The $25 million is there to cover the indemnification obligations to the extent the reorganized debtor, if any of its people submit a claim. And as I'll get to later, actually the claimant trust is obligated to indemnify even people working for the reorganized debtor because they're its agents. For attorneys fees? For everything. It's a broad, extensive indemnification. Okay. So even if they do nothing wrong, they can get sued and that's when things get expensive because you have to hire an attorney and so on. Correct. And this is... So when does this end and the money that's left go back to the creditors? Right. So here's the issue, Your Honor. The litigation in this case has come from one side. It's come from that side throughout the case. There's contempt hearings. The Fifth Circuit, in its other opinion, detailed the substantial litigation. Your Honor could see it in the... And there's more appeals pending. There's seven other appeals that are pending other than this one. And in the confirmation appeal, this court ruled for us in every way except one. So Mr. Guquevina says it differently. So the real question is, what do these people who... These people don't have any claims. They waived their claims. The only interest in this estate, the people who are saying we're here for the creditors, the only interest they have is Duggaboy has a 0.186% contingent, unvested interest in the settlement. So the answer to the question is, when will they give a release? When will they do a settlement? Or will the specter of litigation extend out? And everything they've done thus far indicates it will extend out and it will extend out for the statute of limitations. So yes, that money may stay down, but that money would have stayed in reserve. And counsel said that there was discretion... At the end of the day, whatever that is, if there's money left, it goes to the creditors. Absolutely. And if there's money left after the creditors, it would go 0.18 something percent, would go 0.018, whatever it is. 0.018. 0.186%. 0.18. Okay. Would go to these. Very small. Correct. Correct. So there was an insinuation in the briefing that it wasn't going to go to these parties. And I'd like to talk now about the expectations of the parties. Because that's what U.S. brass requires. Here you're told what the expectation of these parties, again, who don't have any claims, of the 27 people who voted against the plan, 21% of their claims were disallowed or withdrawn of the remaining 6, 1,000th of a percent of the creditor body. So let's talk about the 99.8% in dollar amount who voted for the plan. And because of the litigation onslaught by Dandero, which commenced pre-confirmation, the committee recognized that protecting the people after the effective date was necessary. It was necessary and critical for the plan to become effective and be able to successfully maximize recoveries. Indeed, this was the focus at the confirmation hearing, and for good reason. And in the record, 4156 to 4170 is a chart showing just some of the litigation propounded by Jim Dandero and his proxies, including these appellants. So what did we do? We worked hand in glove with the committee, the committee of the statutory representative, to come up with an alternative, an alternative to protect these people. Because, again, we had these three entities, but this was, consider it, a pair of pants. The creditors owned the pair of pants. And what pocket the stuff came out of didn't matter. But they wanted the people who were controlling the litigation, controlling the reorganization, they wanted the people protected. And the concept that, well, no, it was okay. The reorganized debtor people would be out on an island. It was an independent silo. There's nothing in the record to reflect that. But at the hearing before the Bankruptcy Court to approve the 319, what did the creditor committee council tell the Bankruptcy Court about the formation of the Demody Trust? The creditors' committee council, not me, debtor council, creditors' committee council, said they were the functional equivalent of reserves, that it was consistent with the plan implementation documents that were approved months before, that it was necessary to allow the plan to become effective, thereby fulfilling creditor expectations that the asset monetization process would proceed as planned, and it was consistent with creditor expectations that indemnity costs are senior to creditors' recoveries. That, Your Honors, that is the best evidence of what the plan provides. That is the best evidence of what the creditors' rights and obligations are. Mr. Bukovina could point to changes, changes which at the end of the day are meaningless, but what are the creditors' expectations? What do the creditors believe? So, again, who do we have here? We have HCMFA, who had an administrative claim disallowed by the Bankruptcy Court in 2022 September, and they withdrew all the claims. And NextPoint also had an administrative claim that was disallowed. They withdrew all their unsecured claims and have one unsecured claim which, of course, was denied by the Bankruptcy Court and which is subject to appeal, probably will get to the Fifth Circuit. So these are the people and these are the parties that we have before us. So I'd like to turn a little bit to the post-confirmation plan structure of this. I think that's critical to understanding why the indemnity trust order didn't, as the credit committee argued to the Bankruptcy Court, alter rights and expectations. Pre-confirmation, all of the debtors' business was conducted through one entity, and the debtor and the committee worked carefully together to design a post-confirmation structure to allow these three entities to work seamlessly together to monetize assets. Under the plan, the debtor transferred its assets into three separate restructuring vehicles. The bulk of the assets, including valuable interest in funds managed by the reorganized debtor, were transferred to the claimant trust, and Mr. Seery is the claimant trustee. Litigation assets were transferred to a litigation subtrust because the creditors wanted monetization of assets separated from litigation, prosecution of litigation. And management contracts with third-party investment funds were vested in the reorganized debtor to avoid regulatory complication. But the reorganized debtor's sole function was to wind down these managed funds to maximize the claimant trust's value in these funds, and that was critical to the success of the plan. So again, thinking that the creditors expected that people working on behalf of the reorganized debtor would be stuck and could not seek payment for their indemnification claims if the reorganized debtor doesn't have it, there is nothing in the record that has ranked speculation and everything in the record regarding what the creditors expected is completely to the contrary. The claimant trust sits at the top of the corporate chain and its beneficiaries are the prepetition creditors, and the claimant trust directly or indirectly holds all limited and general partnership interests of the reorganized debtor. And the litigation subtrust is a subtrust of the claimant trust debtor. The monetization of assets, and this is important, at the claimant trust and the reorganized debtor level are managed by one set of ten people. The claimant trustee oversight board ultimately oversees the activities of all the post-confirmation entities and Mr. Seery in his roles as reorganized debtor CEO and claimant trustee, and Mr. Seery supervises this ten-member team whose sole responsibility is to monetize the assets wherever they are, whether they're at the claimant trust or at the managed funds. And under the plans, as I said, they work seamlessly together as one integrated unit, and the net proceeds, they're generated by the reorganized subtrust, they get upstream, and then the claimant trust, together with its assets, will make distributions to the creditors. And as I said, by the time of confirmation, the debtor in the committee had already experienced harassing, frivolous litigation from Dondero, which the bankruptcy court detailed in its confirmation order. And the indemnity trust vehicle is the vehicle by which such protection is implemented, and indeed the plan would not have gone effective without it. There's nothing in the record to support the argument that the real legitimate creditors expected management to be at any risk. And it's counterintuitive and wrong. Of course real creditors wanted to protect who the people who were working hard to maximize recoveries. And as I will now explain, the plan and the implementation documents, which existed months prior to confirmation, before anyone conceived of the indemnity trust, contemplated that the claimant trust could fund the reorganized debtor. So how do I get there? Three places, Your Honor. Number one, section 8.2 of the claimant trust agreement requires the claimant trust to indemnify its respective officers, agents, employees, and professionals. Mr. Rito was incorrect that the only people could be indemnified were the claimant trustee and the oversight board, and he was wrong. Section 8.2, I urge Your Honors to look at it, says the claimant trust can indemnify its agents. Section 23B1 and 23B8 provide that the claimant trust purpose is overseeing the management and monetization of the reorganized debtor's assets pursuant to the terms of the limited partnership agreement. And the same set of ten individuals that I mentioned before, they perform the work for the claimant trust in managing the assets of the claimant trust and the reorganized debtor, and they're supervised by Mr. Seery and overseen by the oversight board. Accordingly, any person performing work for either the claimant trust or the reorganized debtor does so as an agent of the claimant trust and is entitled to indemnification. Second, Your Honor, the claimant trust is authorized to backstop the reorganized debtor's obligations as necessary to preserve the value of the reorganized debtor. Section 3.2C17 of the claimant trust agreement specifically authorizes the claimant trust to take actions reasonably deemed necessary for the protection and maximization of value of the claimant trust assets. And Assembly 33B6 of the claimant trust agreement authorizes the claimant trustee to reserve or retain cash in amounts reasonably necessary to maintain the value of the claimant trust assets. The claimant trustee and the oversight board determined that preservation of the reorganized debtor's value, critical to ultimate recoveries and a fundamental aspect of the plan, required securing the indemnification rights for people working on its behalf. Because the claimant trust agreement approved as part of plan confirmation gave the oversight board and claimant trustee the discretion to take actions to preserve the debtor's value, backstopping the indemnification obligations was indeed contemplated and indeed consistent. The mechanism by which the claimant trust can contribute capital to protect its investment of the reorganized debtor is Section 5B of the reorganized debtor's limited partnership. That section authorizes the claimant trust as its partner to make additional capital contributions to the reorganized debtor to fund its expenses, including its indemnification obligations. And why would the claimant trust make capital contributions to the reorganized debtor? Because as I said, the reorganized debtor's activities are critical to the success of the plan. The reorganized debtor doesn't generate material revenues on its own and it needs the support of the claimant trust to meet the expenses, especially if Dunderin affiliates continue with their litigation onslaught. And Section 6.1 of the claimant trust agreement provides the claimant trustee with broad authority to reserve funds to satisfy expenses necessary to preserve the claimant trust assets and fund the litigation subtrust before making distributing funds to trust beneficiaries. And Section 6.1 is consistent with several other provisions of the plan that also provide reserves, such as Article 4.B.1 of the plan and Sections 3.3.B.6 and 3.4 of the claimant trust agreement. Nothing in the record supports the argument that the creditors expected the reorganized debtor to be an independent silo and unable to look to the claimant trust for financial support. And having ceded control over the decision of whether to fund the trust, of whether to fund a capital contribution, ceded control to the oversight committee, they can't challenge the exercise of that authority, which the claimant trust did and the oversight board did in the context when they signed on to the claimant trust agreement. So, Your Honor, their argument is not consistent with the facts and it's not supported by the case law. The parties have briefed the leading cases on what constitutes a plan modification, none of which support Appellant's argument. In the Fifth Circuit's U.S. Brass case, the debtor modified a plan prior to confirmation to resolve an insurance company's objection, and the change provided that future disputes would be resolved by litigation and not arbitration. The change was critical to the insurance company because it believed that arbitration could result in collusive settlements that would be detrimental to its coverage defenses. Post-confirmation, the parties argued for a reason why they withdrew their objection and said, no, we're going to proceed by arbitration. This was by no means a slight change, as Appellants argue. Rather, because this change modified a fundamental plan provision which the insurance company relied upon in withdrawing their objection, the Fifth Circuit easily found it to be a plan modification. This is nothing like what's going on in this case. Highland and the committee created the indemnity trust to function as self-insurance and act as the equivalent of a reserve to fund expenses that the plan documents allowed to be paid and which were necessary to insulate the management from Appellant's onslaught. And the Second Circuit's joint asbestos case was the same thing. The plan carefully created a priority and distribution mechanism for asbestos claims for post-confirmation trust. The trust became insolvent. They tried to restructure the trust, and they failed to do so. In conclusion, the Court should affirm, as both the Bankruptcy Court and the District Court ruled, the creation of the indemnity trust did not alter the rights or obligations of the parties or an expectation, nor did the plan and implementation documents, were they modified in any way. And the indemnity trust was consistent with credit expectations. And I refer back to, how do we know this, Your Honor? Don't take my word for it. Take the word of the creditors' committee. Let me ask one question. Sure. If we were to affirm here, is that the end of this case? This is going on and on and on like a bad novel. And I know a little bit about lengthy bankruptcy cases. And I know that there are a lot of people being compensated. When is this case over? You know, Your Honor, that's a really good question, and that's something that we had hoped would have happened two years ago. Unfortunately, because of these appellants, controlled by Jim Dondaro, it's not going to end. And why is it going to end? Because there are several, seven other appeals. They have indicated they are going to file a cert petition from this Fifth Circuit's opinion, which pretty much granted, overruled most every one of their planned objections. And what is their concern? Their concern is the gatekeeper, that this Court ruled was totally acceptable. And why are they going to continue this onslaught? And who is hurt by this? Who is hurt by this are the creditors, the legitimate creditors.  Mr. Dondaro? Your Honor, as if I may point out the obvious, neither Mr. Draper nor I represent Mr. Dondaro. And we're not Mr. Dondaro. And I urge the Court, as it must, to respect the corporate distinction and the corporate form. My clients, my two clients, represent billions of dollars of third-party investments, pensioners, retirees, governmental entities. Well, they got hooked up with Dondaro, didn't they? Mr. Dondaro controls my clients because he makes investment decisions. This is true. But again, we are not Mr. Dondaro. We have not been held in contempt. We have not had a contempt hearing against us. We have not filed multiple lawsuits. We've had them filed against us. I myself defended five adversary proceedings, having filed none. Well, I mean, what comes through loud and clear, at least to me, is that this is a feeding frenzy. And I would suggest, Your Honor, that it's a feeding frenzy on Dad's side. Well, everybody's being paid. A cushy trust that will go on in perpetuity, protected by $25 million of what they call now self-insurance, protected by vast exculpations, which this Court did strike most of. What do you do? What needs to be done to shut this thing down? We need to get back to how Chapter 11 ought to work. Varying economic interests and a chessboard where everyone has their tools and a settlement is forced. That's why we're here arguing against this, because the way that the bankruptcy court has allowed this to proceed is basically no accountability, ad infinitum. They have five lawyers here today, probably at $1,500 per hour. Your Honors can see what's going on. And as long as the creditors, 27 of which voted against this plan, cannot sit down and negotiate something. We filed a competing plan, for example, that would have paid more money cash up front. But, Your Honors, I urge the Court not to get too far astray on this. He said, she said, Don Darrow, bad guy. Do not allow, Your Honors, expediency, necessity, reasonableness to override the bankruptcy code. Tell me, I've forgotten. Who was the bankruptcy judge here? Jernigan, Your Honor. Judge Stacey Jernigan. This case is missing. This wasn't her first case. No. This is not her first case. But I would remind Your Honors of the Andova case. It served for, I don't know, 20 years or something like that. Judge Jernigan has served for, I think, since 2006. But I would remind Your Honors that we did prevail already on the exculpations. So my position is that... No, I'm not saying that we cannot overrule someone who has served for... I'm saying that, I'm saying that... It's just that bankruptcy has its up and down and complexity. And I think she's well aware of that. Judge Jernigan is certainly well aware of that. Judge Jernigan is no spring chicken. Judge Jernigan has certainly given her undivided attention to this case. And Judge Jernigan has made mistakes before. Your Honor might recall the Jeff Baron Andova cases where this court reversed and vacated something like 96 orders entered by Judge Jernigan and Judge Fitzwater. Well, I'm well aware that we can't... Not Fitzwater, but... That a brand new judge can be affirmed and a judge who has served for many decades can be reversed and that is not the issue. But the point I think that Judge King is trying to get to is like, how will this ever end and how is your methodology beneficial to finalizing this bankruptcy? Judge Haines, I think that the question that you pose is a logical one. One that I would love to discuss with the court, you know, in a social setting. But here we have Section 1120... Well, we can do that, so you're stuck answering us now. The court needs to enforce the bankruptcy code as written. And again, Mr. Dondero's alleged vexatiousness, the debtor's alleged reasonableness, they don't matter under Section 1127B if this is a plan modification, Judge Haines. If it's not a plan modification, then all their arguments hold water. All their arguments are reasonable. We're not arguing that the bankruptcy court would have what our ruling have on all of these other appeals, if any. I don't think, Judge Stewart, it would have an effect on these other appeals because the other appeals that are working for the system right now are more or less standard litigation, breach of contract, torts. I think that this is... But do those need the indemnity that's part of this bucket? No, Your Honor. I do not believe so. But, Judge Stewart, I think you've asked a more important question, which is if the court affirms this, then it's going to open the door, the title door. Bankruptcy is already way too flexible, way too equity-based. The bankruptcy court already has amazing powers. This is one of the few bankruptcy code provisions that limits those, that limits the naked and raw exercise of equity. Your Honors, do not, again, under expedience or all of these arguments of vexatiousness allow this provision and protection to be written out of the code. I'm sure I'm missing a lot, but a key question is, was there a planned modification here? And if we affirm saying there was no planned modification, I'm not sure what door is left to be opened. I mean, it seems like the gate's already open in terms of all that you said, but I don't see that we have, like, a systemic issue before us in terms of how bankruptcy operates, but a somewhat narrow one in terms of whether there's a planned modification. I'm just trying to understand. Whatever we decide, certainly if we affirm, won't affect these others, but I guess still doesn't answer for us where the end is. Maybe there is no end, I guess, until the $25 million runs out. I don't know. That's not a question. That's just . . . Well, this is what we do for a living. We got lifetime tenure, so maybe we'll spend the rest of our life learning about bankruptcy. I'm not trying to make light of it at all, but as was said, most of these cases, the people who lose are unhappy that they lose and feel like somehow the judges didn't understand it, they missed it and whatever, but there's a lot to be said for finality. We appreciate the robust argument and certainly the briefing in the case, and we'll cut through it and issue a ruling as expeditiously as possible. We thank counsel for your help. All right, this will conclude the second case. Before we shift gears to the last two cases, the panel will stand in just a short recess.